No. 92-127

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

JAMES STANLEY TEN EYCK

        Petitioner and Appellant,

    -vs-

STATE OF MONTANA,
DEPARTMENT OF JUSTICE,

        Respondent and Respondent.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                In and for the County of Flathead,
                The Honorable Robert Boyd, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        David M. Ortley, Attorney at Law, Kalispell, Montana

        For Respondent:

        Hon. Marc Racicot, Attorney General, Helena,
        Montana
        Kathy Seeley, Assistant Attorney General, Helena,
        Montana
        Ted O. Lympus, County Attorney, Kalispell, Montana
        Ed Corrigan, Deputy County Attorney, Kalispell,
        Montana

FILED

AUG 6 - 1992

Filed:_____
CLERK OF ___ ___ COURT
STATE OF MONTANA

Submitted on Briefs:  June 25, 1992

Decided:  August 6, 1992

                                        Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the District Court of the Eleventh Judicial District of the State of Montana, in and for the County of Flathead. On January 14, 1992, the driver's license of appellant James Stanley Ten Eyck (Ten Eyck) was seized pursuant to § 61-8-402(3), MCA, due to his refusal to submit to a chemical test to measure or detect alcohol in his body. Ten Eyck appealed the suspension of his license to the District Court pursuant to § 61-8-403, MCA, and following an evidentiary hearing, the District Court refused to reinstate the appellant's driver's license. Ten Eyck now appeals, we reverse.

Two issues are presented on appeal:

1. Should the District Court have rescinded the suspension of Ten Eyck's driver's license on the ground that the hearing on his petition was held more than ten days after written notice of the petition for judicial review was provided by defense counsel to the county attorney?

2. Did the District Court err in holding that Ten Eyck was placed under arrest prior to his refusal to submit to a blood test to determine the presence or amount of alcohol in his body?

On January 14, 1992, at approximately 9:30 p.m., Officer Clancy King of the Montana Highway Patrol received a report of a two-vehicle accident on Highway 93, north of Kalispell, Montana. When he arrived at the scene of the accident he found only a blue Ford pickup which was located in front of Ten Eyck's residence. The pickup had recently sustained extensive front-end damage. The

2

owner of the Ford pickup had abandoned the vehicle and left the scene of the accident. A witness reported to Officer King that he believed he saw another vehicle involved in the accident being parked in Ten Eyck's garage. Tire tracks leading from the scene through the snow supported the witness' statement.

Approximately ten minutes after Officer King arrived at the scene, Ten Eyck walked down his driveway to speak with Officer King. He admitted that he was one of the drivers involved in the accident. Officer King observed Ten Eyck's pickup parked in his garage and noted that it too had recently sustained damage including extensive damage to the bumper area, the tailgate and box area and the rear window had been broken out. Officer King asked Ten Eyck to have a seat in his patrol car to examine his driver's license; at that time the Officer became aware of an odor of alcohol coming from Ten Eyck. Officer King questioned Ten Eyck if he had been drinking and Ten Eyck informed the Officer that he, indeed, had consumed a couple of beers.

Although Ten Eyck suffered minor injuries from the accident including an injury to his left arm and a bump on the head as a result of hitting his head on the rear window of the truck, he did not request medical assistance. Officer King testified that he did not notice any impairment of Ten Eyck's speech, noting that it was understandable but was marked with frequent hesitation or pauses. Further, Officer King did not notice any impairment in Ten Eyck's balance. Due to the head injury, Officer King decided that the "one-legged stand" field sobriety test should not be given. Officer King did, however, perform a Horizontal Gaze Nystagmus

3

(HGN) test on Ten Eyck and testified that "there was a nystagmus at the maximum deviation" indicating to the Officer that Ten Eyck's blood alcohol content was "[m]ost likely, . . . over a .10, which is blood alcohol concentration." However, Officer King went on to say that "[a] head injury will cause a nystagmus in some people."

Due to the Officer's perception of the odor of alcohol, Ten Eyck's admission that he had been drinking, and the results of the HGN test, Officer King testified that he informed Ten Eyck that he was going to request a blood test. During direct examination, Officer King testified that Ten Eyck was under arrest for Driving under the Influence, DUI, but on cross-examination the Officer testified that after he had administered the HGN test, and discussed with Ten Eyck his injuries from the accident, he informed him that another officer would be coming shortly to transport him to the hospital, where they would request a blood test. Officer King conceded on cross-examination that while sitting in his patrol car he did not specifically tell Ten Eyck that he was under arrest; but said that later when he was reading the implied consent form to Ten Eyck in the hospital's emergency room, he told Ten Eyck that he was under arrest. On further cross-examination, Officer King admitted that he did not recall at any time at the hospital or throughout the incident specifically telling Ten Eyck: "You are under arrest."

While Officer King and Ten Eyck were waiting for another officer to take Ten Eyck to the hospital, Ten Eyck's wife arrived home; she ultimately took Ten Eyck to the hospital, due in part to the additional officer's less than timely arrival. After being

4

examined at the hospital, Officer King had conversations with both Mr. and Mrs. Ten Eyck and ultimately Ten Eyck refused to give a blood sample. Officer King testified that Ten Eyck read the implied consent form before he refused the test. Ultimately Ten Eyck was allowed to return home with his wife. Ten Eyck's driver's license was subsequently seized.

Ten Eyck filed his petition for judicial review of the suspension of his driving privilege on January 23, 1992. Later, the District Court gave the county attorney and Ten Eyck's attorney written notice that the matter was set for a hearing ten days later, on February 10, 1992.

In response to the issue of whether the District Court erred in denying the appellant's motion for a rescission of the suspension of his driver's license on the ground that the hearing on the appellant's petition was held more than ten days after a written notice was given to the county attorney, we note that the District Court had fully complied with this Court's interpretation of the requirements of § 61-8-403, MCA, in the case of State v. Johnson (1979), 182 Mont. 24, 594 P.2d 333. In Johnson, the statute provided for thirty days' written notice of the hearing to the county attorney; it was amended in 1983 to be limited to a ten-day time period. Here the notice requirements of § 61-8-403, MCA, have been fulfilled. In appellant's reply brief, he acknowledges that he was unaware of the decision in Johnson. Ten Eyck sets forth no support for his claim that he was denied due process. He received a District Court hearing within nineteen days after he filed his petition for judicial review of his driver's license

5

suspension. There is no evidence presented before the District Court as to whether the appellant was affected by the suspension or even whether he complied with the suspension of his license. He apparently had possession of his driver's license for at least part of the time between his refusal and the hearing. The law provides that Ten Eyck was entitled to a 72-hour driving permit following the seizure of his license and could have obtained a stay of suspension of his license pending his appeal. See Matter of Vinberg (1985), 216 Mont. 29, 699 P.2d 91.

As to the second issue presented to us, whether the District Court erred in holding that Ten Eyck was placed under arrest prior to his refusal to submit to a blood test to determine the presence or amount of alcohol in his body, we find that the record does not support the District Court's holding.

The record does not support a finding that the appellant was placed under arrest or ever physically restrained by Officer King. It is evident that on both direct and cross-examination there is considerable question whether Officer King directly indicated to Ten Eyck, either at the scene of the accident or throughout their discussions, that he was under arrest. Ten Eyck was allowed to go to his house while an investigation was made by the Officer; the Officer allowed Ten Eyck's wife to take her husband to the hospital and it was not until several hours after the accident and after he had been read the implied consent form, that Ten Eyck had any reason to believe he could not walk away free; after Ten Eyck refused to take the blood test, Officer King left the hospital and Ten Eyck's wife took Ten Eyck home; no citations were issued; no

6

court dates were set; and Ten Eyck had no reason to believe that at any time during this period he was under arrest.

On this record we conclude that Ten Eyck was not arrested and the subsequent suspension of his driver's license was unlawful and said suspension should be rescinded. We reverse the District Court in this matter and direct the court to reinstate James Stanley Ten Eyck's driver's license. Reversed and remanded.

Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1988 Internal Operating Rules, this decision shall not be cited as precedent and shall be published by its filing as a public document with the Clerk of the Supreme Court and by a report of its result to Montana Law Week, State Reporter and West Publishing Company.

Justice

We concur:

Chief Justice

Justices

7